**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  October 31 2014**

_____
John P. Gustafson
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 11-33239 |
| | ) | |
| Medcorp, Inc. | ) | Chapter 7 |
| Stickney Avenue Investment Properties, | ) | |
| LLC | ) | Adv. Pro. No. 13-03065 |
| Medcorp E.M.S. South, LLC | ) | |
| | ) | Judge John P. Gustafson |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| John N. Graham, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| The Huntington National Bank, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>MEMORANDUM OF DECISION AND ORDER REGARDING MOTION OF DEFENDANT THE HUNTINGTON NATIONAL BANK FOR SUMMARY JUDGMENT</u>

This cause is before the court on Defendant The Huntington National Bank's

("Huntington" or "Bank") Motion for Summary Judgment ("Motion") [Doc. # 24], filed on

January 3, 2014. The Affidavit of David Bartlett was filed as Exhibit A to the Motion, and the Credit and Security Agreement between Huntington, Medcorp, Inc., and Medcorp E.M.S. South, LLC was filed as Exhibit B

The Plaintiff is John N. Graham ("Plaintiff"), the Chapter 11 Trustee in the underlying bankruptcy case filed on June 10, 2011 by Medcorp, Inc. ("Medcorp")[1]. Plaintiff's Complaint ("Complaint"), filed on May 2, 2013, seeks to avoid and recover an alleged preferential transfer that was received by defendant Huntington within one year of Medcorp's petition date under U.S. Bankruptcy Code Sections 105(a), 547, 550, and 1106.

On January 16, 2014, Plaintiff filed a Brief in Opposition to Huntington's Motion for Summary Judgment. [Doc. #30]. Huntington filed a Reply Brief on April 8, 2014 [Doc. #44], and the Plaintiff, with leave of court, filed a Surreply Memorandum in Opposition on April 17, 2014. [Doc. #49].

Huntington asserts two grounds for granting Summary Judgment in its favor: 1) Huntington had a security interest in the deposit accounts of Medcorp, and therefore a transfer of funds from that account could not enable Huntington to receive more than it would have received in a hypothetical Chapter 7 under §547(b)(5); and, 2) that Huntington, based upon its conduct with the court appointed receiver[2] for MedCorp, cannot be deemed an "insider" for preferential transfer purposes based upon the definitional provision that

---

[1]/ Plaintiff John N. Graham is the court appointed Chapter 11 Trustee of Medcorp, Inc. ("Medcorp"), Stickney Avenue Investment Properties, LLC ("Stickney"), and Medcorp E.M.S. South, LLC ("Medcorp South"). These entities were administratively consolidated.

[2]/ Mark S. Uhrich of the Hillyer Group was appointed as receiver pursuant to an August 6, 2010 state court order. [Doc. #42-1, Ex. 1, pp. 80-96].

2

includes a "person in control of the debtor"[3].

The Plaintiff has submitted documents obtained during discovery to support his opposition to the Motion for Summary Judgment.

## FACTS

The following facts are undisputed. On August 28, 2009, Medcorp executed a Credit and Security Agreement ("Security Agreement") [Doc. # 24-2, Ex. B]. The Security Agreement granted Huntington a security interest in "all of [Medcorp']s business assets," including Medcorp's "Deposits." [*Id.* at Section 1.17]. In its Motion, Huntington states that at all times relevant to this case, Medcorp "maintained a bank account at Huntington which constitutes a 'deposit account' under UCC 9-102 (Ohio R.C. 1309.102(A)(29))." [Doc. # 24].

On or about January 11, 2010, Medcorp filed a complaint in the Franklin County Court of Common Pleas against Ronald A. Fresco, Amy S. Thomas and Reminger Co., LPA ("the Reminger action"). The state court complaint sounded in malpractice, arising from Reminger Co., LPA's representation of Medcorp in proceedings before the Ohio Bureau of Workers' Compensation, including the appeals that followed. [Doc. # 1, Ex. 1].

Medcorp experienced financial difficulties, and on August 6, 2010, Huntington filed a complaint for cognovit judgment and a motion for the appointment of a receiver. [Doc. 42-1, Ex. 1, p. 81]. The motion requested the appointment of Mark S. Uhrich as receiver. Judgment was granted against Medcorp for approximately $10 Million [Doc. #42-1, Ex. 1,

---

[3]/ *See,* 11 U.S.C. Section 101(31)(B)(iii); 11 U.S.C. Section 547(b)(4)(B).

3

pp. 77-79], and a "Consentual [sic] Order Appointing Receiver was entered [Doc. #42-1, Ex. 1, pp. 80-96] (hereinafter "Order Appointing Receiver"). The Order Appointing Receiver states that it was in the best interests of Medcorp and its creditors to appoint Mark Uhrich as the receiver. [Doc. # 6, p. 4; Doc. #42-1, Ex. 1, pp. 80-96].

In September, 2010, a settlement of the Reminger action was reached (the "Reminger Settlement"). The Reminger Settlement called for the payment of $750,000 to Medcorp. On September 16, 2010, a $750,000 check from Navigators Insurance Company was deposited into Medcorp's operating account with Huntington. [Doc. #24-1, Ex. A, p. 2 ¶4 & p. 3]. On September 27, 2010, Huntington received check #120670 dated September 21, 2010, payable to Huntington in the amount of $685,678.46. [Doc. #24-1, Ex. A, p. 2 ¶5 & p. 6]. This amount was drawn from Medcorp's Huntington account, #1479773860. [Doc. #24-1, Ex. A, p. 2 ¶3]. This sequence of events, documented in the Affidavit of Huntington Senior Vice President David J. Bartlett, "Affidavit In Support Of Motion Of The Huntington National Bank For Summary Judgment" [Doc. #24-1, Ex. A], has not been contradicted by the Trustee. The Reminger Settlement, the deposit of the Reminger Settlement funds into MedCorp's account, and the subsequent payment of $685,678.46 to Huntington, occurred during the period that Mark S. Uhrich was the receiver for Medcorp.

On June 20, 2011 (the "Petition Date"), Medcorp filed a petition seeking relief under Chapter 11 of the Bankruptcy Code.

Plaintiff, the Chapter 11 Trustee in the underlying bankruptcy case, filed the Complaint commencing this action on May 2, 2013. In the Complaint, Plaintiff alleges that the transfer of the Reminger Settlement, from Medcorp to Huntington, was a preferential

4

transfer. Pursuant to 11 U.S.C. §547, Plaintiff states that the transfer was made to a creditor of Medcorp, on account of an antecedent debt owed by Medcorp to Huntington, that occurred while Medcorp was insolvent, that the transfer was made to an insider within one year of Medcorp's petition date, and that the transfer enabled Huntington to receive more than it would have under a chapter 7 case had the transfer not occurred. [Doc. #1].

After Huntington's Motion to Dismiss was denied by the court [Doc. # 14], the Bank filed an Answer [Doc. #20], and then filed a Motion for Summary Judgment. [Doc. # 24].

Huntington's Motion seeks summary judgment, claiming that the Plaintiff is unable to prove, under 11 U.S.C. §547(b)(5), that the alleged preferential transfer allowed Huntington to receive more than the bank would have received in a hypothetical Chapter 7 liquidation.

In the alternative, Huntington asserts that the court should grant it summary judgment because the Plaintiff is unable to meet his burden of proving, by a preponderance of the evidence, that Huntington was an "insider" for purposes of 11 U.S.C. §547(b)(4)'s requirement that a transfer, if made between ninety days and one year, was made to an insider as defined by 11 U.S.C. §101(31)(B). [Doc.#24].

In response to Huntington's Motion, the Plaintiff-Trustee filed a Memorandum in Opposition. [Doc. #42]. The Plaintiff asserts that the Motion should fail, as genuine issues of material fact still exist. Plaintiff notes that Huntington is not challenging that the requirements of subsections (1), (2) and (3) of §547(b) have been met. Rather, Huntington challenges Plaintiff's claims regarding subsections (4) and (5). [*Id.*, at p. 8]. Plaintiff asserts, regarding subsection (5), that "Huntington did not have a lien on the Reminger claims, and

5

thus, it did not have a lien on their proceeds." [*Id.* at p. 9]. Plaintiff argues that Huntington never had a lien on the Reminger proceeds, and because they did not, the question remains as to whether Huntington received more than it would have under a hypothetical Chapter 7 liquidation[4].

In the Trustee's Memorandum in Opposition, Plaintiff also addresses Huntington's argument that the Bank is not an "insider" for purposes of §547(b)(4) and §101(31)[5]. As with his §547(b)(5) argument, Plaintiff believes a genuine issue of material fact exists as to the "insider" issue. Plaintiff states that while Huntington argues that "creditors are not generally insiders of their borrowers... [they] did not, however, assert that creditors cannot, as a matter of law, be insiders." [*Id.* at p. 14].

During discovery, Plaintiff obtained approximately 16,000 pages of evidence. These documents are largely comprised of e-mails "between combinations of receivership personnel, Huntington personnel, and their respective attorneys." [*Id.* at p. 18.] Plaintiff alleges that the voluminous e-mails show frequent contact between Huntington, the Receiver, and attorneys from both parties, and that contained in the evidence is proof that Huntington "directed the Receiver to pay the Reminger proceeds to the bank." [*Id.*] This alleged control of the debtor MedCorp, is evidenced by what the Plaintiff-Trustee argues is Huntington's control of the Receiver. Based on the amount of control Huntington is accused of exercising over the Receiver, Plaintiff asserts that the evidence creates a genuine issue of

---

[4]/ Preference defenses under Section 547(c) - several of which were asserted as affirmative defenses in Huntington's Answer - are not in issue on summary judgment.

[5]/ The allegation in the Complaint stated: "Huntington is an insider of MedCorp as a result of its control over its Receiver, Mark Uhrich." [Doc. #1, p. 4, ¶27].

6

material fact as to Huntington's status as an "insider" for preference purposes. [*Id.* at p. 24].

Huntington's reply brief focuses on the specific allegations in Plaintiff's Complaint regarding the transfer. [Doc. #44]. Huntington states that, while Plaintiff "has made a lengthy presentation on facts demonstrating Huntington was an insider," summary judgment should be granted based upon the inability of the Trustee to meet the requirement of Section 547(b)(5), because Huntington had a perfected security interest in the funds transferred to the Bank. [*Id.*]. To paraphrase, Huntington believes that the court does not need to rule on Huntington's possible §547(b)(4) "insider" status in order to grant the Motion for Summary Judgment.

Huntington's argument that it had a perfected security interest is based upon the transfer as described in Plaintiff's Complaint. In the Complaint, Plaintiff alleges that the transfer of $685,678.46 occurred on or about September 21, 2010, when the monies were transferred[6] from Medcorp's bank account to Huntington. [Doc. #1, Main Document, ¶25 ("25. On or about September 21, 2010, MedCorp paid Huntington $685.678.46 ("The Transfer"[7])."] Huntington asserts that "[t]he Complaint does not allege that the payment to the Debtor of $750,000 from the malpractice insurer was a preferential transfer. Nor does the Complaint allege that the receiver's deposit of the $750,000 into the Debtor's Huntington bank account was a preferential transfer." [Doc. #44, p. 3]. Huntington's position is that the

---

[6]/ It appears, instead, that September 21, 2010 was the date on the face of the check. [Doc. #24-1, Ex. A, p. 6].

[7]/ In this Opinion, the court will refer to the alleged September 21, 2010 transfer of the Reminger Settlement funds to Huntington bank as "The Transfer" - as it is designated in the Trustee's Complaint. When referencing the more general allegation that unsecured funds from the Reminger settlement were transferred to Huntington Bank at some point in September, 2010, "transfer" will not be capitalized.

7

allegation that the Receiver's deposit of the $750,000 from the insurer into the Debtor's deposit account was a preferential transfer is first stated in Plaintiff's Memorandum in Opposition. [Doc. # 42, p. 10]. Huntington argues that because the Plaintiff did not specifically plead that the deposit of funds into Medcorp's account and the attachment of Huntington's security interest was the preferential transfer, and because Plaintiff did not amend his Complaint, the court should not consider Plaintiff's preferential transfer allegations as stated in his Memorandum in Opposition. [Doc. # 44, pp. 4-5].

On April 17, 2014, Plaintiff filed a Surreply Memorandum in Opposition to Huntington's Motion [Doc. # 49] to address Huntington's claims that the Plaintiff attempted to add or modify his claims by means of his Memorandum in Opposition. The Plaintiff asserts that the claim and theory of the Complaint has never changed. "[I]t is still a preference claim ... it is based on the bank having obtained the proceeds of an unencumbered asset during the preference period. All that has changed is the exact mechanics of the transaction are now known." [*Id.*, at p. 4]. In short, Plaintiff argues that through discovery, the facts surrounding the transfer have become more clear, but the substance of the Complaint remains the same.

None of the evidence submitted by the Trustee, in response to Huntington's Motion for Summary Judgment, was in the form of depositions or affidavits.

## LAW AND ANALYSIS

### I. Summary Judgment Standard

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising under a case under Title 11. This proceeding

13-03065-jpg   Doc 54   FILED 10/31/14   ENTERED 10/31/14 15:15:54   Page 8 of 37

has been referred to this court by the district court under its general order of reference. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine avoidance of preferential transfers are core proceedings that the court may hear and decide. 28 U.S.C. §157(b)(1) and (b)(2)(F). For the reasons that follow, Huntington's Motion for Summary Judgment will be granted.

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, however, all reasonable inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue for trial exists if the evidence is such that a reasonable factfinder

9

could find in favor of the nonmoving party. *Id.* "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence to support" its position. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

## II. Preferential Transfers under 11 U.S.C. § 547

Plaintiff seeks to recover a transfer made by Debtor to Defendant as a preference under 11 U.S.C. § 547(b). Section 547(b) provides as follows:

> Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made–
>>> \* \* \* \* \* \*
>>> (B) between ninety days and one year before the date of the filing of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>> (5) that enables such creditor to receive more than such creditor would receive if–
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

"[A]ll five enumerated criteria must be satisfied before a trustee may avoid any transfer of property as a preference." *In re Fulghum Const. Corp.*, 706 F2d 171, 172 (6th Cir. 1983), *cert. den.*, 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310. "The trustee bears the burden

10

of proving each of the five elements." *In re Southern Air Transport, Inc.*, 511 F.3d 526, 534 (6th Cir. 2007). In this case, it is important that the Trustee has the burden of proof as to Huntington's "insider" status. *See*, §547(g); *In re Kong*, 196 B.R. 167, 171 (N.D. Cal. 1996)("The finding of an "insider" is generally a question of fact, and it is one on which the trustee bears the burden of proof. 11 U.S.C. §547(g). However, the issue can in appropriate cases be resolved by summary judgment. In reference to the bank's summary judgment motion, the trustee had to produce evidence sufficient to meet the shifting burdens defined in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)."); *In re Emerson*, 235 B.R. 702, 706 (Bankr. D.N.H. 1999)(citing cases)").

The pleadings and evidence in this case show that Defendant is, and was at the time of the transfer, a creditor of Debtor[8] and that the transfer was of an interest of the Debtor in property. In September of 2010, when the transfer at issue occurred (either on September 16, 2010, or September 21, 2010, or September 27, 2010[9]) Debtor owed Huntington the approximate amounts of $6,657,346.18 and $3,363,049.56, plus interest on the unpaid principal sums of $6,570,273.94 and $3,343,106.30, including all costs and expenses incurred by Huntington to collect the outstanding amounts (including reasonable attorneys' fees)[10], pursuant to a cognovit Judgment Entry in favor of Huntington.

Thus, there does not appear to be any dispute that the transfer was made for the benefit

---

[8]/ Doc. #1, Complaint, ¶¶13 & 15; Doc. #20, Answer, ¶¶13 & 15.

[9]/ September 27, 2010 is the date the check in issue was received by Huntington. That is also the date the check issued to Huntington appears to have been honored by the "drawee bank". *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). The fact that the drawee bank was Huntington itself appears to have expedited the clearing process. [Doc. 24-1, Ex. A, p. 5].

[10]/ Doc. #1, Main Document, ¶15; Doc. #20, ¶15; Doc. #42-1, Main Document, pp. 77-79.

11

of a creditor (Huntington), and that the transfer was "for or on account of an antecedent debt" owed by the Debtor. [Doc. #1, Main Document, ¶30; Doc. #20, ¶30].

Huntington denied, for want of knowledge, the allegation that the Debtor was insolvent at the time of the transfer. [Doc. #20, ¶31]. However, insolvency is not one of the elements that Huntington has asserted in support of its Motion for Summary Judgment.

At worst, there is a genuine issue of material fact regarding whether the transfer was made within one year of the filing of Medcorp Chapter 11 Petition. The Complaint alleges that "The Transfer" was made within one year before June 10, 2011, the date Debtor's bankruptcy petition was filed. Huntington has argued that, under the terms of its security agreement, it became secured in the Reminger Settlement funds no later than September 16, 2010, when those funds were deposited in Medcorp's bank account - approximately 8 months before the filing of the Chapter 11 case.

It is the remaining two elements of a preference that are the focus of Huntington's Motion for Summary Judgment: A) that the bank did not receive more from "The Transfer" than it would have in a hypothetical Chapter 7 case; and, B) that the Trustee cannot show that Huntington was an "insider" of the Debtor for preference purposes under Section 547(b).

A.    **The Complaint's Allegation That "The Transfer" Occurred On September 21, 2010, After Huntington's Security Interest Attached To The Reminger Settlement Proceeds Based Upon The Funds Having Been Deposited In Medcorp's Bank Account On September 16, 2010.**

Preference claims are not limited to direct transfers of money or property. The preferential "transfer" can also be the attachment of a security interest. *See*, *In re Dickson*, 655 F.3d 585 (6th Cir. 2011); *In re Lewis*, 398 F.3d 735, 748 (6th Cir. 2005); *In re LaRotonda*,

436 B.R. 491, 496 (Bankr. N.D. Ohio 2010). In this case, the Trustee alleged in his Complaint that: "On or about September 21, 2010, MedCorp paid Huntington $685,678.46 ("The Transfer")." [Doc. #1, Main Document, ¶25]. Because Huntington's security interest attached to the funds when the $750,000 from the Reminger Settlement was deposited into MedCorp's account, Huntington argues essentially that if "The Transfer" is the money paid to Huntington on September 21, 2010 (or September 27, 2010), the Bank was fully secured[11] - having a security interest on every dollar that was transferred to it on that date.

However, if the "transfer" is viewed as being the attachment of the security interest in the funds that were deposited into Medcorp's account on September 16, 2010, that "transfer" of a security interest in funds is what would allow Huntington to receive more than it would have in a hypothetical Chapter 7 case. *See*, *In re Qualia Clincal Service, Inc.*, 652 F.3d 933 (8th Cir. 2011); *Deel Rent-A-Car, Inc. v. Levine*, 16 B.R. 873, 875 (S.D. Fla. 1982)("the transfer of any security interest that converts an unsecured creditor into a secured creditor does enable that creditor to receive a greater percentage of its claim than other creditors in the same class.").

First, it should be noted that this entire line of argument could have been avoided if the Trustee had amended his Complaint[12] and alleged that the transfer occurred when

---

[11]/ *See*, *Triad International Maintenance Corp. v. Southern Air Transport, Inc. (In re Southern Air Transport, Inc.)*, 511 F.3d 526, 533 (6th Cir.2007)(*quoting Ray v. City Bank & Trust Co. ( In re C–L Cartage Co.)*, 899 F.2d 1490, 1493 (6th Cir.1990)); *In re Cannon*, 237 F.3d 716, 720 (6th Cir. 2001)("pre-petition payments to a fully secured creditor are not preferential because the creditor would not receive more than in a Chapter 7 liquidation"), *citing*, *In re Summit Financial Services, Inc.*, 240 B.R. 105 (Bankr. N.D. Ga. 1999); *In re Stinson Petroleum Co., Inc.*, 506 Fed.Appx. 305, 309 (5th Cir. Jan. 7, 2013).

[12]/ "If, in the course of discovery, new claims or defenses come to light, a party may move to amend its pleading, and a Court must freely grant leave to amend 'when justice so requires.' Fed.R.Civ.P. 15. Thus, the rules grant parties latitude to fine-tune their arguments so that the issues and facts are well-developed

13

Huntington's security interest attached to the unsecured Reminger Settlement funds. Rule 15(a) provides that leave to amend shall be freely granted when justice so requires. Where new information on the transfer became available through discovery, it is hard to imagine circumstances in which a court would not allow an amendment altering the allegation regarding the date of the transfer from September 21, 2010 - the date the Trustee initially thought the funds were transferred to Huntington - to September 16, 2010 when the $750,000 check from Navigators Insurance Company was deposited into Medcorp's account and became subject to Huntington's security interest in funds on deposit in that account.

However, in this case, leave to amend was not sought, and the court is left with a difficult determination regarding the extent to which allegations in briefs can overcome deficiencies in the underlying complaint[13].

In many jurisdictions, case law would appear to require the granting of Summary Judgment in favor of Huntington because the specific allegation in the Complaint does not support the granting of relief. For example: "In the Ninth Circuit, if a complaint does not include the necessary factual allegations to state a claim, it is not sufficient to allege such claims in a motion for summary judgment." *Desert Protective Council v. U.S. Dept. Of the Interior*, 927 F.Supp.2d 949, 962 (S.D. Cal. 2013)(citing cases).

Huntington cites *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407

---

when the court is called upon to enter judgment on the merits." *Prim Capital Corp. v. May (In re May)*, 2006 WL 4458360 at *4, 2006 Bankr. LEXIS 4196 at *12-13 (Bankr. N.D. Ohio Aug. 14, 2006), *aff'd*, 2007 WL 2052185, 2007 Bankr. LEXIS 2335 (6th Cir. BAP July 19, 2007). "[A] plaintiff wishing to assert a new basis of recovery should amend the complaint. *See* 10A Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp.2006)." *Id.*

[13]/ This is a an interesting legal issue on many levels. However, for purposes of this decision, the discussion will be primarily centered on precedent.

F.3d 784, 789 (6th Cir.2005), a case in which the appellate court refused to consider an unpleaded estoppel theory first advanced in response to a motion for summary judgment. In affirming the grant of summary judgment, the court of appeals stated that to hold otherwise would "subject defendants to unfair suprise". *Tucker*, 407 F.3d at 788.

In an unpublished decision, Judge Harris held that an unpleaded new basis for non-dischargeability raised for the first time in response to a motion for summary judgment, "has been advanced too late in the proceedings and subjects [movant] to unfair surprise." *Prim Capital Corp. v. May (In re May)*, 2006 WL 4458360, 2006 Bankr. LEXIS 4196 (Bankr. N.D. Ohio Aug. 14, 2006), *aff'd*, 2007 WL 2052185, 2007 Bankr. LEXIS 2335 (6th Cir. BAP July 19, 2007).

However, there is another line of recent Sixth Circuit decisions which limit the *Tucker* holding in cases where the change made in response to the motion for summary judgment does not result in unfair surprise because of adequate notification of the new argument.

In *Moore v. City of Harriman*, 272 F.3d 769, 774 (6th Cir. 2001)(en banc), the appellate court held that: "Even assuming the complaint itself failed to provide sufficient notice, Moore's response to the officer's motion to dismiss clarified any remaining ambiguity." Subsequently, in *Vencor, Inc. v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 641 n.11 (6th Cir. 2003), the Court of Appeals held that a new claim that was not stated in the initial complaint, but raised in opposition to a Motion for Summary Judgment in the District Court, was nevertheless preserved for appeal.

In 2009, *Carter v. Ford Motor Co.*, 561 F.3d 562, 566-67 (6th Cir. 2009) went even further in allowing an unpleaded claim to permit plaintiff to survive summary judgment:

15

These allegations are, to say the least, "short and plain." Ford argues that "on its face" the complaint "does not allege that [Carter] was improperly terminated and then reinstated in 2005." True, the bulk of the complaint refers to facts that were relevant to Carter's Title VII claims (which she voluntarily withdrew), and the complaint contains little in the way of "supporting facts" to give Ford notice that her FMLA claim encompasses events in spring 2005. Yet the "Background Facts" section does state that Carter began working for Ford in 2001 — which might reasonably be interpreted to provide notice that the lawsuit includes events that occurred throughout Carter's employment. And Count IV describes Ford's "failure to restore" her to "equivalent ... terms and conditions of employment," which, arguably, could include Carter's probationary reinstatement in April 2005 — a condition of employment not "equivalent" to the collective bargaining protections she had before she was terminated. Notably, besides her 2001 start date, the complaint does not tie its allegations to any particular date or event. Carter's complaint is not a model of clarity or specificity. On balance, even when construed "so as to do justice," it is, at best, ambiguous as to whether it encompasses allegations arising out of her 2005 termination.

The *Carter* court, stating that "the issue is fair notice," nevertheless affirmed summary judgment against the plaintiff because her discovery responses, particularly her deposition testimony, made it clear that she was suing based upon a 2006 request for medical leave, rather than her 2005 reinstatement. *Carter*, 561 F.3d at 568. The *Carter* court stated:

> Of course, the notice inquiry necessarily proceeds on a case-by-case basis. Sometimes, as we have recognized, a claim raised in response to a summary judgment motion provides sufficient notice to the opposing party. *See, e.g.*, *Vencor v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 642 n. 11 (6th Cir.2003); *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 442 n. 6 (6th Cir.2008) (unpublished). But those cases are distinguishable because they did not involve, as here, an earlier express disavowal of the very claim the party attempted to raise in response to summary judgment.

*Id.*, at 569.

The *Howington* case, cited with approval in *Carter*, involved an appeal from the

16

district court's grant of summary judgment. In reversing the granting of summary judgment, the *Howington* court stated:

> Defendants contend Plaintiff cannot, after arguing in district court that she was terminated, assert that the suspension constituted the adverse employment action. This argument is without merit. Plaintiff's opposition to Defendants' motion for summary judgment effectively informed Defendants and the district court that Plaintiff believed she experienced a tangible job detriment when Kirk told her to leave work, and that she believes he did so because of her refusal to have sex with him."

*Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 442 n. 6 (6th Cir. 2008).

Similarly, in *Copeland v. Regent Elec., Inc.*, 499 Fed.Appx. 425, 435 (6th Cir. Sept. 6, 2012), the court of appeals again focused on the fact that:

> A plaintiff may sufficiently notify a defendant of an argument by raising it in a response to summary judgment, *see id.* at 774 (*citing Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir.1995)); *Vencor, Inc. v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 641 n. 11 (6th Cir.2003), provided that the party does not disavow its intent to use the argument earlier in the proceedings, *see Carter*, 561 F.3d at 568.
>
> We conclude, in accord with *Moore* and *Vencor*, that Copeland's response to the motion for summary judgment[14] adequately notified defendants of his new argument.

Courts in the Sixth Circuit have followed these decisions in denying motions for summary judgment. *See e.g.*, *Peake v. Martinea Fabco Hot Stamping, Inc.*, 2011 WL 1118572, 2011 U.S. Dist. LEXIS 32127 (E.D. Mich. March 28, 2011)("The Sixth Circuit has repeatedly found that a claim raised in response to a summary judgment motion provides sufficient notice to the opposing party.").

---

[14]/ In *Spees v. James Marine, Inc.*, 617 F.3d 380, 390-91 (6th Cir. 2010), notice of a mixed-motive claim was found (in addition to the Complaint's use of the indefinite article "a") in a footnote to Plaintiff's Motion for Summary Judgment.

17

It should also be noted that while *Tucker*[15] states that the liberal pleading rules do not apply on Summary Judgment, *Carter v. Ford Motor Co.*[16] still states that a "court must construe pleadings 'so as to do justice,'" Fed.R.Civ.P. 8(e), and "liberally in order to prevent errors in draftsmanship from barring justice to litigants." *Ritchie v. United Mine Workers of Am.*, 410 F.2d 827, 833 (6th Cir.1969).

Here, the allegation of a preferential transfer is plainly stated in broad outline. Settlement proceeds of $750,000, that the Trustee asserts were not subject to a security interest, were transferred (in whole or in part) to Huntington within one year of the filing of the Chapter 11 petition. [Doc. #1, Main Document, ¶¶19-29]. The difference in time between the allegation in the response to summary judgment, that the transfer occurred upon the deposit of the funds into Medcorp's account on September 16, 2010, and September 21, 2010 when funds were alleged to have been transferred to Huntington from that account, is less than a week. The concept that the attachment of a security interest can be a preference is well settled law.

The Sixth Circuit cases that deal with the adequacy of notice provided by a response to summary judgment often speak in terms of the complaint being "ambiguous". Here, the Complaint does state that the transfer was "on or about" September 21, 2010. While there are also more specific statements in Complaint, regarding the payment of the funds transferred (in the specific amount of $685,678.46), the date of September 21, 2010 is stated as an approximation in the Complaint. [Doc. #1, Main Document, ¶25].

---

[15]/ *Tucker v. Union of Needletrades, Indus. & Textile Employees,* 407 F.3d 784, 788 (6th Cir. 2005).

[16]/ *Carter v. Ford Motor Co.*, 561 F.3d 562, 566 (6th Cir. 2009).

18

The issue is whether there has been "adequate notice" under the *Vencor/Carter* line of cases, or "unfair surprise" under the *Tucker* line. "The notice inquiry necessarily proceeds on a case-by-case basis." *Peake v. Martinrea Fabco Hot Stamping, Inc.*, 2011 WL 1118572, 2011 U.S. Dist. LEXIS 32127 (E.D. Mich. March 28, 2011), *citing*, *Carter v. Ford Motor Company*, 561 F.3d 562, 568 (6th Cir. 2009). On this issue, the court finds for the Trustee. There should have been no surprise (much less unfair surprise) when the defense of the security agreement attaching liens to deposits was asserted, that the date of the transfer would move back to the date the funds were deposited.

Huntington argues that the proper procedure - a motion for leave to amend - should have been followed. And that should have been done. But, its pleadings do not cite any specific way in which the Bank's position has been prejudiced. [Doc. #44, pp. 2-5]. The difference of five days in the date of the transfer does not push the transfer into close proximity to either the one year period for insider preferences, or the ninety day time frame, where a finding of insider status would not be not be necessary. Nor is "subsequent new value", or any other time sensitive preference defense, at issue on Summary Judgment.

One factor in the Sixth Circuit decisions that Huntington has not asserted is that it was prejudiced in pursuing discovery on this issue. This was an important factor in *Carter v. Ford Motor Co.*, 561 F.3d 562 (6th Cir. 2009). There appears to be no real difference in the issues Huntington would need to explore to defend this aspect of the asserted preferential transfer. Under either transfer date, the extent of Huntington's security interest in the Reminger Settlement (if any) before the alleged transfer occurred (*i.e.*, an argument that the Bank's security interest attached more than one year prior to the filing date) would involve

19

the same underlying law and facts[17].

Just as important is the fact that the underlying facts, both the deposit of the funds into the MedCorp account, and the payment to Huntington, were pleaded. This was, and remains, a preference action. No new statutory provision is involved.

Accordingly, while this is a close issue, the court denies Huntington's Motion for Summary Judgment on this basis.

## B. The Complaint's Allegation That Huntington Was An "Insider" Of The Debtor For Preference Purposes.

Shortly after the Trustee's Complaint was filed, Huntington filed a Motion to Dismiss Adversary Proceeding on the pleadings under Rule 12(b)(6). [Doc. #6]. The focus of the Motion to Dismiss was the Trustee's allegation that Huntington qualified as an "insider" for preference purposes, under Section 547(b)(4)(B) and Section 101(31)(B).

In denying the Motion to Dismiss, Judge Whipple noted that the decision denying judgment on the pleadings was a "close call". [Doc. #14, p. 6].

As evidence in support of the assertion that Huntington was an "insider" of MedCorp for preference purposes, the Trustee has submitted a large volume of e-mail and other communications between Huntington, the Receiver (Mark Uhrich), counsel for the Reciever, and other individuals.

---

[17]/ The Trustee asserts that Huntington's security interest did not extend to the Reminger Settlement until it was deposited in the Medcorp account because it was a "commercial tort" claim and the security agreement did not describe the claim with sufficient particularity. *See*, O.R.C. §1309.102(13) [UCC 9-108]; *Epicentre Strategic Corp. - Mich. V. Perrysburg Exempted Vill. Sch. Dist.*, 2006 WL 16245612005 U.S. Dist. LEXIS 27889, *6-7 (N.D. Ohio Nov. 15, 2005); *In re Residential Capital, LLC*, 497 B.R. 403, 415 (Bankr. S.D.N.Y. 2013)(construing New York's version of UCC 9-108.); *In re Zych*, 379 B.R. 857 (Bankr. D. Minn. 2007)(construing both Minnesota and Iowa law). It is also unclear whether the claim was in existence at the time MedCorp signed the security agreement with Huntington. Under *Epicentre*, an after acquired property clause in a security agreement cannot create a security interest in a "commercial tort".

20

The Trustee has also cited the precise language of the Common Pleas Court Order, paragraph 2 c), that states that expenditures the receiver may make for ordinary course expenses do not include payments for: "(ii) debts, the payment of which is subject to the review of this court; and, (iii) any expenditure outside the ordinary course of business of MedCorp and EMS in excess of $25,000." *See*, August 6, 2010, "Consentual [sic] Order Appointing Receiver" [Doc. #42-2, Ex. 1 pp. 80-96 at 84-85].

The language of the Order appointing the receiver appears to prohibit the transfer of the funds to Huntington without court approval. The Trustee cites the *ultra vires* action of the Receiver as evidence of "control" for purposes of Section 547(b)(4)(B).

The Trustee's Memorandum in Opposition to Motion of Defendant the Huntington National Bank for Summary Judgment points to a motion filed in state court shortly after the creation of the receivership, requesting authority to sell vehicles for $10,000 and "to distribute the proceeds of the sale to the Bank on account of its lien." [Doc. #42-10, Ex. 9, pp. 2-3]. Yet, in paying over $750,000 to Huntington from the Reminger settlement, the Receiver did not request approval from the state court.

Huntington asserts that a Michigan bankruptcy case, *In re Bear Creek Partners I, LLC*, 2010 WL 3928526, 2010 Bankr. LEXIS 3514 (Bankr. W.D. Mich. Oct. 4, 2010), "unequivocally stated that because the receiver answers to the court that appointed it, the receiver could <u>not</u> be an 'insider' Summary judgment is thus appropriate." [Doc. #24, Main Document, p. 11](emphasis in original).

A review of the *Bear Creek* decision reflects that Huntington overstates the scope of the holding of the case. In *Bear Creek*, the discussion of the receiver arises in the context

21

of a motion to dismiss a Chapter 11 case. In deciding that motion, the court stated: "though the court should not require the Debtor to establish that its plan will be confirmed, or that its sale motions or adversary proceeding will succeed, it can and must make a prediction about the merits of each in order to determine whether the UST has established 'cause' for dismissal." *In re Bear Creek Partners I, LLC*, 2010 WL 3928526 at *2, 2010 Bankr. LEXIS 3514 at *6 (Bankr. W.D. Mich. Oct. 4, 2010).

The statement made by the *Bear Creek* court is thus made in the context of a prediction about the outcome of litigation that, at that time, had not been fully litigated. What the decision actual says is: "In its complaint, the Debtor asks the court to find that the state court's receivership order transformed the Receiver and derivatively the Trust into insiders. The court would certainly hesitate before making such a finding for several reasons, not the least of which is that the Receiver answers, ultimately, to the Emmet County Circuit, rather than the Trust." *In re Bear Creek Partners*, 2010 WL 3928526 at *3, 2010 Bankr. LEXIS 3514 at *9. A prediction that the court would "hesitate" is not an unequivocal statement that a receiver could not be an "insider" because the receiver answers to the state court, no matter what *ultra vires* acts the Trustee might prove, or levels of control by the secured creditor were demonstrated.

It should be noted that the *Bear Creek* decision goes on to state:

> More generally, the control that a secured creditor exercises over a debtor does not typically transform the creditor into an insider. *See In re Octagon Roofing*, 124 B.R. 522, 530 (Bankr.N.D.Ill.1991)(exercise of financial control by a creditor over a debtor which is incident to the creditor-debtor relationship, does not make the creditor an insider); *In re Huizar*, 71 B.R. 826, 832 (Bankr.W.D.Tex.1987)(creditor-lending institutions must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider)."

22

*In re Bear Creek Partners*, 2010 WL 3928526 at *3, 2010 Bankr. LEXIS 3514 at *9.

In this case, discovery on this matter has been concluded. In order to prevail, the Trustee needed to "set forth specific facts showing that there is a genuine issue for trial" under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 92 L.Ed.2d 202 (1986). The Trustee must point to evidence that, when construed most strongly in the Trustee's favor, can meet the standard for "control" that would make a secured creditor like Huntington an insider for preference purposes.

There is a long history of courts being reluctant to find a level of control that is merely a circumstance attendant to the debtor-creditor relationship to be sufficient to confer "insider" status on a creditor. One of the influential early cases was Judge Richard L. Speer's decision in *In re Babcock Dairy Co. of Ohio*, 70 B.R. 657, 660-61 (Bankr. N.D. Ohio 1986)[18]:

> It does not appear that a standard has been established for determining the degree to which a person must control a debtor before he is considered to be an insider. However, it does appear that the person or entity must have at least a controlling interest in the debtor, *Louisiana Industrial Coatings, Inc. v. Pertuit (In re Louisiana Industrial Coatings, Inc.)*, 31 B.R. 688

---

[18]/ There is an error that has entered some of the case law that relates to the *Babcock Dairy* decision. The Trustee cites *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 742-43 (Bankr. D. Del. 2003) for the quote: "Lending institutions have been found to be insiders when exerting 'dominion and control,'" or, when they "exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy and the disposition of assets." [Doc. #42, Main Document, p. 14 n. 33]. *Exide Techs* cites, *Aluminum Mills Corp. v. Citcorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 894 (Bankr.N.D.Ill.1991), which in turn is quoting *Babcock Dairy*. The typo in *Exide Techs* is that the word "unquantifiably" is actually "unqualifiably" in the phrase which it quotes. The problem may be that the more common adverbial form of the word is "unqualifiedly". The word "unqualifiable" has, as one of its meanings, "without reservations; unconditioned.". The American Heritage Dictionary of the English Language (Houghton Mifflin Co. 1976) [Judge Speer's dictionary]. Other courts have expressed the requirement as: "to be determined a person in control, the person must control the company so as to dictate corporate policy and disposition of corporate assets without limits." *Gray v. Manklow (In re Optical Techs., Inc.)*, 252 B.R. 531, 539 (M.D.Fla.2000), *aff'd*, 246 F.3d 1332 (11th Cir.2001).

13-03065-jpg    Doc 54    FILED 10/31/14    ENTERED 10/31/14 15:15:54    Page 23 of 37

(Bkcy.E.D.La.1983), or that the person must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets. *See*, *Bergquist v. First National Bank of St. Paul (In re American Lumber Co.)*, 5 B.R. 470 (D.Minn.1980). It is insufficient that the alleged insider had only a superior bargaining position in a contractual relationship with the Debtor. *Schick Oil & Gas, Inc. v. Federal Deposit Insurance Corp. (In re Schick Oil & Gas, Inc.)*, 35 B.R. 282 (Bkcy.W.D.Okla.1983).

*See also*, *Matter of Newcomb*, 744 F.2d 621, 625 n. 4 (8th Cir. 1984)(ability to compel payment is not enough to make a creditor an insider).

Since *Babcock Dairy*, numerous courts have outlined the scope of "control" necessary to hold a bank to be an "insider", and the policies underlying those holdings. The court in *In re Armstrong*, 231 B.R. 746, 749-50 (Bankr. E.D. Ark. 1999) stated:

In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. *ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672 (Bankr. M.D. Fla. 1995). There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake. Thus, reliance on the debtor, a liberal loan policy, and accepting the debtor's projections at face value will not render the bank an insider. *Tinsley & Groom v. W. Ky Production Credit Assoc. (In re Tinsley & Groom)*, 49 B.R. 85 (Bankr. W.D. Ky. 1984). The ability to deposit and to transfer checks to itself does not render the bank an insider as that power is incidental to the debtor-creditor relationship. *In re Hartley*, 52 B.R. 679 (Bankr. N.D. Ohio 1985); *accord Gray v. Giant Wholesale Corp.*, 758 F.2d 1000 (4th Cir. 1985). Even if the bank requires the debtor to submit frequent reports on receivables, invoices, and operations, receives all payments on the receivables, has the power to endorse checks, and obtain concessions from the debtor, the bank is not thereby an insider because there is no control of the day-to-day decision making of the debtor. *Tidwell v. AmSouth Bank ( In re Cavalier Homes of Georgia, Inc.)*, 102 B.R. 878

24

(Bankr. M.D. Ga. 1989). A close relationship with an officer or director of the bank is also insufficient to render the bank an insider. *Burner v. Security State Bank (In re Burner)*, 109 B.R. 216 (Bankr. W.D. Tex. 1989).

In granting summary judgment in favor of the bank in *Damir v. Trans–Pacific National Bank (In re Kong)*, 196 B.R. 167 (N.D. Cal. 1996), the court noted that although the bank knew of the debtor's check-kiting, and threatened the debtor with prosecution, all of the pressure and acts were in connection with the debtor-creditor relationship such that the bank was not an insider. The element, that the bank be able to make the debtor's business decisions, was lacking. *Cf. Ellenberg v. William Goldberg & Co. ( In re Sullivan Haas Coyle, Inc.)*, 208 B.R. 239 (Bankr. N.D. Ga. 1997).

*See also*, *Matter of Wescorp, Inc.*, 148 B.R. 161, 165 (Bankr. D. Conn. 1992)("The uncontested facts establish that the loan agreement between FNEC and the debtor was an independently negotiated transaction, and that the provisions of the loan agreement which might have led to control of the debtor were never implemented or threatened to be implemented. The court has located no authority which supports a determination that under such conditions a lender may be held to be an insider.")

More recently, courts have continued to follow the same standards, holding that: "Reasonable financial controls negotiated at arms' length between a lender and a borrower does not transform a lender into an insider." *In re Radnor Holding Corp.*, 353 B.R. 820, 847 (Bankr. D. Del. 2006). And citing *Octagon Roofing* for the proposition that "exercise of financial control by a creditor over a debtor which is incident to the creditor-debtor relationship, does not make the creditor an insider". *Id*. Similarly, the bankruptcy court in *In re Dott Acquisition, LLC*, 2014 WL 554532 at *36-38, 2014 Bankr. LEXIS 603 at *107- 117 (Bankr. E.D. Mich. Feb. 13, 2014) held, on summary judgment, that the trustee has

25

failed to show that "TTOD and Lapeer" were insiders because they lacked sufficient control.

In an unpublished opinion, the Sixth Circuit Bankruptcy Appellate Panel quoted the *Armstrong* case[19] in affirming the lower court's grant of summary judgment under Section 547(b)(4)(B), where the debtor was an individual, and the alleged "insider" was a corporation. *In re Congrove*, 330 B.R. 880, 2005 WL 2089856 at *8, 2005 Bankr. LEXIS 1599 at *22 (6th Cir.BAP 2005)(unpublished). Notably, the Sixth Circuit Court of Appeals adopted the analysis[20] of the *Congrove* Bankruptcy Appellate Panel in its unpublished opinion. *See*, *In re Congrove*, 222 Fed.Appx. 450, 457 (6th Cir. Jan. 10, 2007).

It is interesting to note that while the courts were generally rejecting assertions that banks could be found to be "insiders" based upon actions taken incident to the creditor-debtor relationship, Congress was statutorily limiting the scope of insider preference claims[21]. The language in the Bankruptcy Code that allowed insider preference claims under *Levit v. Ingersoll Rand Financial Corp. (In re Deprizio Construction Co.)*, 874 F.2d 1186 (7th Cir. 1989) was changed in the Bankruptcy Reform Act of 1994. *See*, 5 Collier on

---

[19]/ "In determining who is an insider, the Court must examine the closeness of the purported insider to the debtor, the degree to which the former is able to exert control or influence over the debtor, and whether the transactions between them were conducted at arms length. The primary focus of the determination is upon the degree of control....

The courts have been reluctant to construe financial oversight-even intrusive oversight—as the control required to impose insider status. The fact that a [party] examines, monitors, and even controls some aspects of the debtor's financial affairs does not render the [party] an insider."

*Meeks v. Bank of Rison ( In re Armstrong)*, 231 B.R. 746, 749–50 (Bankr.E.D.Ark.1999) (internal citations omitted).

[20]/ "On appeal, Congrove again re-raises the arguments it proffered below; namely, that McDonald's was an "affiliate," and therefore an "insider," and the franchiser/franchisee relationship between the two made their dealings those of "insiders." We decline to accept this invitation and, instead, adopt the analysis and conclusion reached by the BAP." *See*, *In re Congrove*, 222 Fed. Appx. at 457.

[21]/ The referenced 1994 amendment was to 11 U.S.C. Section 550.

26

Bankruptcy ¶ 547.03[3][a] at 547-29 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). The recovery of insider preferences was further restricted in 2005 through the addition of Section 547(i), "to effectuate fully the efforts of the Bankruptcy Reform Act of 1994 to protect banks by adding safe harbor provisions of section 550." 5 Collier on Bankruptcy ¶ 547.03[3][a] at 547-29 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

A review of the evidence reflects the kind of interactions that a debtor, or a receiver, would have with a banking institution that holds a security interest in most of the assets of the business. [Doc. #42, Main Document, pp. 19-24 and cited Exhibits]. There are informational e-mails, discussions and requests for approval of various actions being taken during the receivership. What is not reflected in the evidence provided is a level of day-to-day control that is outside the bounds of the debtor-creditor relationship that existed between Huntington and MedCorp, based upon Huntington being a secured creditor with a perfected security interest in most of MedCorp's assets.

Even when viewing the Trustee's evidence in the light most favorable to his position that Huntington met the requirement of "control" under the statute, the structural problems would also be a factor preventing a reasonable fact finder from holding that Huntington qualified as an insider based upon the evidence submitted.

This is not a case where the creditor and the debtor were engaged in a joint enterprise, or had interlocking directorates, or joint ownership. The Trustee does not appear to dispute that Huntington was a bank making a relatively standard commercial loan to MedCorp. While the case law suggests that this kind of banking relationship generally permits a bank to act in its own interests, as a creditor, without being found to be an insider,

27

there is another layer of difficulty that the Trustee has to overcome in order to prevail.

In the usual situation, where the principals of a business are running the operation, rather than a state court receiver, personal guarantees can be a factor in providing a secured lender additional leverage over the actions of a business. Here, there was a court appointed receiver in place, controlling the business operations. To prevail under Section 547(b)(4)(B), based upon its "control" of the debtor pursuant to Section 101(31)(B)(iii), the Trustee must show that Huntington had the ability to "unqualifiably dictate corporate policy and the disposition of corporate assets"[22] of MedCorp through its control of the Receiver. The Trustee argued the "control" issue on that basis - whether Huntington exercised control over the Receiver who, in turn, controlled the operations of MedCorp. [Doc. #42, Main Document, p. 16].

The Trustee asserts that the Receiver was selected by Huntington, and for purposes of this Motion, that allegation will be assumed to be true. [*Id.*, at p. 22]. The Trustee also cites pre-appointment communication between Huntington and the Receiver regarding the contents of the Receivership Order that would appoint Mr. Uhrich to the position. [#42-11, Ex. 11]. The e-mail actually discusses the "borrower's" proposed changes in the Order Appointing Receiver. The e-mail does allow Mr. Uhrich the opportunity to comment on those proposed changes, "based on your experience in the industry". [*Id*.]

Much of the evidence that the Trustee asserts is proof of this control consists of e-mails from the Receiver's attorney. While these e-mails are relevant evidence relating to the issue on which the Trustee has the burden of proof - the Receiver is the client, and the

---

[22]/ *Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R. 662, 666 (Bankr.N.D.Ohio 1986), and cases discussed *supra*.

13-03065-jpg   Doc 54   FILED 10/31/14   ENTERED 10/31/14 15:15:54   Page 28 of 37

ultimate decision maker, not the Receiver's attorney. Moreover, the attorney for the Receiver's duty is to the Receiver[23]. Counsel for the Receiver sending e-mails asking if Huntington approved of certain actions[24] that were being undertaken is not the same as the Bank controlling those actions[25]. As counsel for the Receiver stated in an e-mail to Bank's counsel dated after the transfer in issue: "I'm cautious and want to run important things by you." [Doc. #42-16, Ex. 16, p. 1]. Notably, in reference to the Reminger litigation, an early e-mail from the Receiver's attorney states "that the final decision about settlement will be [the Receiver's]". [Doc. #42-13, Ex. 13, p. 1].

The Trustee also cites time records that reflect time billed by counsel for Huntington for extensive discussions with counsel for the Receiver, and some discussions that appear to have included the Receiver himself. [Doc. # 47-17, Ex. 17]. A review of the time records do not reflect any "smoking gun" regarding control of the Receiver (and in turn, Medcorp) by Huntington. MedCorp has been described by the Trustee as a multi-million dollar business, with complex issues. Mr. Bage, a shareholder, was attempting to retain control of

---

[23]/ *Cf.*, *KeyBank N.A. v. Shipley*, 846 N.E.2d 290 (Ind. App. 2006)(attorney for receiver did not owe a duty to third parties, it was the receiver who owed the duty); *and compare In re Cont'l Coin Corp.*, 380 B.R. 1, 16 (Bankr.C.D.Cal.2007)(holding that the "trustee's attorney in this case does not owe a statutory or fiduciary duty to the creditors of the estate. The attorney's duties are to the trustee.")(*quoting Wolf v. Kupetz (In re Wolf & Vine, Inc.)*, 118 B.R. 761, 771 (Bankr.C.D.Cal.1990)(noting that while a trustee owes a fiduciary duty to creditors, the attorneys for the trustee do not)).

[24]/ For purposes of this decision on the Summary Judgment Motion, the Trustee's allegation that the transfer of the monies to Huntington violated the state court's Order appointing the receiver is taken as true. However, the language of the Order appears to require two things for a payment of "debt": 1) Bank consent; and 2) court approval. [Doc. #42, Main Document, p. 21]. Requests for the Bank to approve or consent to actions being taken by the Receiver do not appear to be inconsistent with the state court Order appointing the receiver.

[25]/ Even if a reasonable fact finder could find that a "veto" were being offered, an opportunity to exercise control that is not exercised, does not make a creditor a person in control of the debtor. *See*, *In re Radnor Holding Corp.*, 353 B.R. 820, 847 (Bankr. D. Del. 2006)(citing cases).

MedCorp during the receivership. The sale of the ambulance business as a going concern, first by the Receiver, and then by the Trustee, faced resistance. The time records of Huntington's counsel do not provide much in the way of support for the Trustee's theory that the Bank "unqualifiably dictated corporate policy and the disposition of assets", or so "dictated corporate policy and disposition of corporate assets without limits"[26].

In addition to the Receiver and the Receiver's attorney, there were other individuals involved in the transactions in issue here. It appears there was separate counsel for MedCorp, in the Reminger litigation, whose representation may have pre-dated the appointment of the Receiver. [*See*, Doc. #42-10, Ex. 10, p. 2; Doc. #42-12, Ex. 12, p. 2; Doc. #42-13, Ex. 13, p. 1]. There was also an individual involved who is described as MedCorp's corporate counsel. [*See*, Doc. #42-10, Ex. 10, p. 2]. On the other hand, some of the e-mail interactions with Huntington were by individuals with Hillyer Group, the entity which was apparently the employer of the Receiver.

There is some evidence that Huntington may have used economic leverage to push for the payment of the Remington Settlement monies to the Bank. One e-mail states that "once the proceeds are received, the bank will remove restrictions on the company's cash." [Doc. 42-7, Ex. 7, p. 2]. The problem for the Trustee is that economic pressure arising from the contractual positions of the parties to debtor-creditor relationship is not sufficient for a finding of "control"[27].

---

[26]/ *See* footnote 18.

[27]/ "Congrove presented no evidence of day-to-day, *extra contractual control . . . .*" *In re Congrove*, 330 B.R. 880, 2005 WL 2089856 at *8, 2005 Bankr. LEXIS 1599 at *22 (6th Cir.BAP 2005)(unpublished) (emphasis added); *In re Armstrong*, 231 B.R. 746, 749 (Bankr. E.D. Ark. 1999)("The examination of the level of control must be made with the understanding that control over financial affairs may be an

30

> The courts have been reluctant to construe financial oversight - even intrusive oversight - as the control required to impose insider status. The fact that a [party] examines, monitors, and even controls some aspects of the debtor's financial affairs does not render the [party] an insider.

*In re Congrove*, 330 B.R. 880, 2005 WL 2089856 at *8, 2005 Bankr. LEXIS 1599 at *22 (6th Cir.BAP 2005)(unpublished), *quoting*, *In re Armstrong*, 231 B.R. 746, 749-50 (Bankr. E.D. Ark. 1999). Similarly, as part of a discussion of a bank's financial power in *Octagon Roofing*, the court stated that: "Trustee alleges facts which merely demonstrates that the Bank could compel payment of its debt." *In re Octagon Roofing*, 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991).

The Trustee points to information being provided to Huntington regarding MedCorp matters that were in litigation. The e-mails make it clear that the Receiver had a choice whether to continue with litigation, or rely on the protections afforded to MedCorp by the receivership. The choice could be made to halt most litigation on that basis. It appears that the Receiver sought to halt much of the litigation involving MedCorp in order to stop incurring litigation costs. Communications with Huntington regarding pending litigation , or other matters that impacted the finances of MedCorp, does not support a finding of "control" under *Congrove* and *Armstrong*, *supra*..

While the parties spent considerable time discussing the timing of the transaction in the context of the pleadings, the timing of the preferential transfer is important for another reason. Under the majority view, the Trustee's evidence must be sufficient to meet the above standards regarding "control" on the date of the transfer. *See*, 547(b)(4)(B) ("if such

---

unavoidable circumstance attendant to many creditor-debtor relationships. *See ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.)*, 190 B.R. 672 (Bankr.M.D.Fla.1995).").

13-03065-jpg   Doc 54   FILED 10/31/14   ENTERED 10/31/14 15:15:54   Page 31 of 37

creditor *at the time of such transfer* was an insider")(emphasis added).

"The language of section 547(b)(4)(B) clearly states that an insider relationship is to be determined on the *exact date* of the challenged transfer." *In re Camp Rockhill, Inc.*, 12 B.R. 829, 834 (Bankr. E.D. Pa. 1981)(emphasis in original); *see also*, *Dent v. Martin*, 86 B.R. 290, 292 (S.D. Fla. 1988)(*quoting Camp Rockhill*); 5 Collier on Bankruptcy ¶ 547.03[6] n. 92 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)(*quoting Dent & Camp Rockhill*); *Capmark Fin. Group Inc. v. Goldman Sachs Credit L.P.*, 491 B.R. 335, 344-45 (S.D.N.Y. 2013); *In re Bayonne Medical Center*, 429 B.R. 152, 184 (Bankr. D.N.J. 2010); *In re Paschall*, 403 B.R. 366, 377 (Bankr. E.D. Va. 2009).

Thus, for example, where a stock relinquishment agreement was executed just before the receipt of a check during the extended preference period, and the agreement immediately terminated the recipient's insider status, the transfer was not a preference because when the check was honored, the recipient was no longer an insider. *Butler v. David Shaw, Inc.*, 72 F.3d 437 (4th Cir. 1996)[28].

After the deposit of the Reminger Settlement funds into MedCorp's account, the Trustee cites an e-mail request from the Bank that the funds to be paid over be paid via a separate check, rather than debiting the MedCorp bank account. While the transfer was accomplished by check, the original e-mail from the Bank references that per their counsel,

---

[28]/ *Contra*, *EECO v Smedes (In re EECO)*, 138 B.R. 260 (Bankr. C.D. Cal. 1992). Decisions specifically rejecting the *EECO* approach in favor of the "insider on the date of the transfer" rule, include *In re American Eagle Coatings, Inc.*, 353 B.R. 656, 670 (Bankr. W.D. Mo. 2006); *Stanley v. U.S. Bank, N.A.*, 2008 WL 886640, 2008 U.S. Dist. LEXIS 112429 (S.D. Tex. Sept. 23, 2008); *In re NetBank, Inc.*, 424 B.R. 568, 571-72 & n.2 (Bankr. M.D. Fla. 2010); *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264, 273 (Bankr. E.D. Tenn. 2012).

32

a "pay down of debt" would be compliant with "the order"[29].

The Trustee asserts, and the court assumes for purposes of this Motion, that the payment to Huntington of the "net proceeds" of the Reminger Settlement was in violation of the Order Appointing Receiver. This "*ultra vires*" transfer to the Bank is the most troubling fact in this action. However, for purposes of establishing that Huntington was an insider at the time of the transfer, it must be noted that the funds were paid to Huntington after the transfer that the Trustee now claims to be preferential. Accordingly, the fact that the funds were transferred to Huntington without a court order approving the payment is only indirect evidence of the existence of "control" at the time of the preferential transfer when the funds were deposited in MedCorp's account[30]. The fact that the payment was made to Huntington, after Huntington's security interest had attached to those funds, is not sufficient to demonstrate control at the time the Reminger Settlement funds were deposited.

In addition to the lack of direct evidence of Huntington exercising day-to-day control, e-mails from the Receiver and the attorney for the Receiver, cite to the Receiver Order as controlling their actions. [Doc. 42-10, Ex. 10, p. 3; Doc. 42-13, Ex. 13, p. 1 & 2; Doc. 42-16, Ex. 16, p. 3]. The court will not lightly disregard the fact that, under Ohio law, the Receiver was answerable to the state court judge, not Huntington. Particularly when the evidence reflects the parties, in their e-mail discussions, referencing the Order Appointing

---

[29]/ "After speaking with our attorney, he is requesting that you actually write a check to Huntington for the paydown of the settlement. The reason for this is that per the order, the receiver can voluntarily pay down debt, however, the Bank cannot take "excess" money from the company." [[Doc. #42-7, Ex. 7, p. 2].

[30]/ This is not to say that the allegation that these monies were paid over in violation of the Order Appointing Receiver is not a very serious matter. The timing only diminishes the power of this evidence in the limited context of determining whether there is sufficient evidence to meet the case law definition of "control" at the time of the alleged preferential transfer.

33

Receiver as controlling their actions.

Finally, the Trustee refers to the involvement of Huntington in the Receiver's efforts to sell MedCorp as a going concern. Initially, it should be noted that the communications and actions cited by the Trustee start in late October, 2010. Thus, these actions took place several weeks after the transfer at issue here. Thus, the evidence offered would have to be used to prove day-to-day, unqualified control of Medcorp more than a month earlier, at the time of the transfer. While it appears that the Receiver was attempting to maximize the return to Huntington, through the going concern sale of the business, there is no "smoking gun" demonstrating the kind of control that would suffice to hold that Huntington was an "insider".

Moreover, the Order Appointing Receiver states that "no sale of Bank collateral shall take place, outside the ordinary course of MedCorp's or EMS's business during the operation thereof by the Receiver under this Order, without the express written consent and authorization of Bank and, further, entry by the Court, following notice and a hearing, of an order approving such sale of Assets." [Doc. #42-1, Ex. 1, ¶12 at p. 92-93]. It is difficult to see how the Receiver could comply with the Order Appointing Receiver without consulting with Huntington, and obtaining the Bank's consent to any sale.

Huntington had a perfected security interest in most of the assets being sold. The fact that the Receiver (and persons in the Hillyer Group) were communicating with the Bank is something that would be expected given the complexity of the sale, the competing offers, and the explicit requirement for Bank consent in the Order Appointing Receiver. While "taking out" the Huntington position is part of the discussions, there are also references to

34

the Receiver's control of the sale process. [[Doc. #42-6, Ex. 6, p. 121]. Reviewing this evidence, especially in light of its indirect nature - as evidence of control at an earlier date - it fails to create a genuine issue of material fact.

In addition to looking at the specific actions cited by the Trustee in his pleadings, the case law talks about determining insider status "on a case-by-case basis from the totality of the circumstances". *See*, *In re Longview Aluminum*, 657 F.3d 507, 509 (7th Cir. 2011); *In re Parks*, 503 B.R. 820, 828 (Bankr. W.D. Wash. 2013); *In re Dewey & LeBoeuf LLP*, 2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014). This type of analysis is often referenced in the context of an allegation that a defendant is a "non-statutory insider".

The Trustee's pleadings do not use the term "non-statutory insider", but the Trustee does argue that the definition of "insider" found in 101(31) is not exclusive, and that "an entity may either be a statutorily defined insider, or an insider by virtue of a close relationship". *Citing*, *In re AFI Holdings, Inc.*, 355 B.R. 139, 152-153 (9th Cir. BAP 2006).

Viewed in its totality, the evidence submitted by the Trustee does not raise a genuine issue of material fact on the issue of whether or not Huntington was an insider. The Receiver and Huntington were clearly attempting to get along in a situation where their goals were generally aligned. The Receiver was appointed on August 6, 2010, and information was exchanged on expenses and operations. At the time of the Reminger Settlement, in mid-September, 2010, the Receiver had been in place a little over a month. There was no evidence of Huntington controlling that litigation - rather it appears to have been a situation where many parties had some input, with no substantial evidence suggesting that the Receiver did not make the ultimate decision to settle the Reminger litigation.

13-03065-jpg    Doc 54    FILED 10/31/14    ENTERED 10/31/14 15:15:54    Page 35 of 37

Some of the e-mails the Trustee cites as being evidence of suspiciously excessive communication between the Receiver and Huntington include information about decisions that the Receiver has already made, without input from the Bank. For example, counsel for the Receiver tells Huntington that "the Receiver decided to let [the Reminger litigation] proceed using MedCorp's existing counsel, Chip Collier from Benesch." [Doc. #42-12, Ex. 12, p. 2; Doc. 42-10, Ex. 10, p2]. MedCorp's "in-house counsel" was also "asked to stay on for the time being" by the Receiver. [Doc. #42-12, Ex. 12, p. 1; Doc. 42-10, Ex. 10, p2]. While these are relatively minor matters, they stand in contrast to the paucity of evidence of directives issued by Huntington to the Receiver.

Later in the state court receivership, both the Receiver and Huntington appear to have been focused on trying to expeditiously sell the business as a going concern in the case of declining business, concerns about the quality of the accounts receivable, and with Richard Bage (a Director[31] and 100% shareholder[32]) remaining in the picture as critic, potential purchaser, and ultimately, as the signatory to the Chapter 11 Petition that eventually ended the receivership.

While the court does not discount that the parties involved in the receivership are sophisticated, and may have known that their correspondence would be subject to discovery at some point in the future, the documentary evidence submitted by the Trustee does not demonstrate Huntington stepping over the line from its inherent status as the primary secured creditor to being the entity that exercised day-to-day managerial control of MedCorp through

---

[31]/ Case No. 11-33239, Doc. #2.

[32]/ Case No. 11-33239, Doc. #121 , p. 81.

13-03065-jpg    Doc 54    FILED 10/31/14    ENTERED 10/31/14 15:15:54    Page 36 of 37

the state court appointed Receiver.

Accordingly, the Motion for Summary Judgment has established that Defendant Huntington is entitled to judgment as a matter of law under Rule 56.

**THEREFORE**, for the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 24] be, and hereby is, **GRANTED**.

The court will enter a separate Judgment in accordance with this memorandum of decision.